UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
ROBERT BURMEISTER, JR.,

                  Plaintiff,

                                 MEMORANDUM & ORDER
      -against-                   18-CV-1047 (JS)

COMMISSIONER OF THE SOCIAL
SECUIRTY ADMINISTRATION,

                  Defendant.
----------------------------------X
APPEARANCES
For Plaintiff:        John Hewson, Esq.
                    Fusco, Brandenstein & Rada, P.C.
                    180 Froehlich Farm Boulevard
                    Woodbury, New York 11797

For Defendant:       Matthew Silverman, Esq.
                    United States Attorney's Office, EDNY
                    Civil Division
                    271 Cadman Plaza East, 7th Floor
                    Brooklyn, New York 11201

SEYBERT, District Judge:

        Plaintiff Robert Burmeister, Jr. ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (42 U.S.C. § 405(g)), challenging the Commissioner of Social Security's ("Commissioner") denial of his application for disability insurance benefits. Presently pending before the Court are Plaintiff's motion for judgment on the pleadings, (Pl. Mot., D.E. 10), and the Commissioner's cross-motion for judgment on the pleadings, (Def. Mot., D.E. 12). For the following reasons, the Commissioner's cross-motion is GRANTED and Plaintiff's motion is DENIED.

Plaintiff applied for disability insurance benefits on September 30, 2013 (R. 10, 100) alleging disability since September 20, 2008 (R. 170). His application was denied on August 29, 2014. (R. 111-21.) Plaintiff requested a hearing. (R. 124-25). He appeared with counsel at a hearing before the Administrative Law Judge ("ALJ") on October 11, 2016. (R. 78-99.) On October 26, 2016 the ALJ issued a decision finding Plaintiff was not disabled from September 20, 2008 through the date last insured. (R. 7-20.) The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-6.) The present action followed. (Compl., D.E. 1.)

## DISCUSSION

I.  Standard of Review

In reviewing the ruling of an ALJ, the Court does not determine de novo whether the plaintiff is entitled to disability benefits. Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the

---

[1] The background is derived from the administrative record filed by the Commissioner on June 13, 2018. (R., D.E. 9). For purposes of this Memorandum & Order, familiarity with the administrative record is presumed. The Court's discussion of the evidence is limited to the challenges and responses raised in the parties' briefs.

ALJ.  See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists.  See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003).

## II.  The ALJ's Decision

Here, the ALJ applied the familiar five-step process (see 20 C.F.R. §§ 404.1520, 416.920) and concluded that Plaintiff was not disabled from the date of onset (September 20, 2008) through the date last insured (December 31, 2014) (R. 10, 19).  He found that during the relevant period, (1)  Plaintiff had "severe impairments of obesity; bilateral shoulder impairment; a lumbar impairment; right elbow, knee, wrist, and hip impairments; and asthma," (R. 12); (2) "Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in [the Act], (R. 12); (3) he had the "residual functional capacity ["RFC"] to perform light work," with exceptions, (R. 14); and (4) although Plaintiff "was unable to perform any past relevant work," (R. 18), "there were jobs that existed in significant numbers . . . [he] could have performed," (R. 19).

## III. Analysis

Plaintiff first argues that the ALJ's RFC determination is "devoid of any explanation or basis."  (Pl. Br., D.E. 11, at

8.)  He claims that the decision "fails to rely upon any evidence from any specific source and instead appears to make up its own RFC assessment" and that the ALJ used "selective reporting of the record" and "cherry picked the aspects of medical reports he preferred." (Pl. Br. at 9, 10.)  Second, he argues that the ALJ's step-five finding that he could have found work in the national economy was not supported by substantial evidence and that the ALJ used an improper hypothetical to arrive at his conclusion.  (Pl. Br. at 11-12.)  The Commissioner responds that (1) the RFC finding was supported by substantial evidence and the ALJ afforded appropriate weight to the medical opinions in the RFC discussion, (Def. Br., D.E. 12-2, at 17-23); and (2) the step-five finding was supported by substantial evidence and the hypothetical was proper, (Def. Br. at 23-34).

    A.   The RFC Finding

        1. Evidence

            a.   Plaintiff's Testimony

Plaintiff was 54 years old at the hearing.  He was a high school graduate and worked as a New York City firefighter from 1988 to 2008. (R. 15, 82-83.)  He receives a pension.  (R. 83.)  He lived with his wife, mother-in-law, and two college-age children.  A typical day for him would be getting his children off to school, watching television, letting the dog out, and visiting his parents who lived two miles away--"just little small errands

like that." (R. 89.) Laundry could be difficult for him and he only did light grocery shopping. (R. 90.) Although he was able to shower and dress himself, sometimes movement such as buttoning his shirt and tying his shoes would give him issues. (R. 91.) He drove "close to every day" locally and would take one to two longer trips per year. (R. 92-93.) On longer trips, he would stop multiple times and split the driving with family members. He went to his time share in Cancun, Mexico once a year. On the flight he would get up and walk around to take a break from sitting. (R. 93.)

His back, knee, and shoulder were the biggest problems he had. (R. 84.) With his back, he was "constantly aware" of it being "very stiff" but sometimes "when it actually [gave him] the problem" he would not be able to get up and be "laid up for a day, two, three, would be maybe four or five times a year." (R. 84.) He thought the issue was his shoulder, but "it turned out [he had] a herniated disc in the neck also." (R. 88.) He could only sit from one to two hours before his back started to stiffen up, only stand for about 20 minutes before he had to sit or move around, and only walk about a mile before having to take a break. (R. 84-85.) He had problems lifting "heavy" things around the house, such as a vacuum or a case of water, but could lift a gallon of milk. (R. 85.)

His right wrist had "limited movement" and he had a "tear in [his] elbow" and he could not "lift [his] hand over [his] shoulder without having . . . significant pain at times." (R. 86.) At its worst, the pain in his shoulder could be a "six or a seven" but on a "good day . . . five." (R. 86.) This made it difficult to do even little things like grabbing a cup of coffee, changing a light bulb, or putting on his coat. (R. 86-87.) He dropped things one to two times a week and "the dexterity in the right hand isn't the best." (R. 87.)

At the time of the hearing, Plaintiff was on Prednisone, a steroid, and an antacid for his stomach. (R. 91-92.) He could not take pain medications or anti-inflammatories because he did not "do all that well" with them. (R. 91-92.)

### b. Dr. Burmeister[2]

Plaintiff saw general practitioner Burmeister during the relevant period.[3] In December 2009, he complained of lower back pain that radiated to his right leg causing numbness and tingling.

---

[2] Dr. Rhonda Burmeister, in addition to being Plaintiff's treating physician, is his wife. The ALJ did not consider this issue.

[3] The Court notes that although Plaintiff argues, in a conclusory fashion, that Burmeister's physical capacity evaluation is "supported by the medical records from [her] office," he makes no attempt to summarize those records or point to relevant portions. Rather, he supports his statement with a general citation to over 100 pages of medical records. (Pl. Br. at 6.) Plaintiff does not address the records or opinions from Dr. Graber or Dr. Muhlrad in his statement of facts.

(R. 347.) Upon examination on December 8, 2009, Burmeister observed pain on range of motion and tenderness with palpation. Plaintiff had a positive straight leg raising test on his right side. Plaintiff had a normal gait. Burmeister prescribed Naprosyn, an anti-inflammatory drug. (R. 348.) She also recommended an MRI, which subsequently revealed "mild multilevel diffuse disc bulging without significant central canal stenosis or foraminal narrowing." (R. 243.) He returned to Burmeister in April 2010, this time reporting three months of pain in his right hip, worse on the outside, radiating to his thigh, that was worse when walking or lying on his right side. (R. 345.) Upon examination, he walked with an antalgic gait (a gait that develops to avoid pain when walking) and had pain with abduction (movement away from the body) of the right hip. Burmeister prescribed Celebrex, another anti-inflammatory. (R. 346.) He had another MRI in May 2010 that revealed "degenerative change in the right hip with fraying of the labrum and low grade split through the direct superior labral base. There [was] a small region of high grade partial thickness cartilage loss over the anterior aspect of the joint." (R. 240.)

He returned in July 2010 complaining of severe pain and weakness in the right leg. He continued to walk with an antalgic gait. Burmeister prescribed a Medrol Dosepak, another anti-inflammatory. (R. 343-44.) In May 2011, he complained of

persistent pain in his lower back, right hip, right knee, and right elbow. (R. 338.) The pain increased when walking on stairs and with prolonged sitting or standing. (R. 338.) In December 2011, Plaintiff recounted severe pain in his right shoulder and an inability to lift items. (R. 335.) Burmeister noted pain in his right elbow with decreased range of motion. On examination, he had tenderness to palpation; Burmeister recommended rest and ice. (R. 335-36.) This general pattern continued for Plaintiff's visits. He complained of pain, noted difficulties walking or standing or lifting things. Examination typically revealed tenderness to palpation and Burmeister prescribed anti-inflammatories and recommended rest and ice. (See generally R. 321-402.) By August 2013, he reported that chiropractic treatment and medication provided no relief, and stated he was unable to sit or stand for a long period of time. He had pain using stairs, bending, or lifting. (R. 327.) Burmeister opined in her notes that he was "totally disabled." (R. 328.)

In October 2013, she completed a physical capacity evaluation, concluding that in an eight-hour work day Plaintiff could sit for one hour or less and stand or walk for one hour or less, and that he should avoid lifting or carrying any weight, bending, squatting or reaching overhead. (R. 270.) She further opined that he could not use his hands for sustained repetitive actions such as fine manipulation, simple grasping, pushing or

pulling arm controls, or reaching overhead.  He could not use his legs and feet for sustained repetitive action.  (R. 270.)  In November 2013, Plaintiff had gastric lap band surgery to address his morbid obesity.  (R. 281-84.)  He again saw Burmeister in December 2013 and reported pain in his right foot and he walked with an antalgic gait.  (R. 321-22.)  He had an MRI which suggested plantar fasciitis.  (R. 386.)[4]

### c.   Dr. Kelly

One day after Burmeister issued her physical capacity evaluation, Kelly, a doctor in her practice, issued an identical opinion.  (R. 269.)  It does not appear from the record that Kelly actually treated Plaintiff.

### d.   Dr. Muhlrad

Plaintiff visited Muhlrad, an orthopedist, from February to April 2014.  Muhlrad found "mild paraspinal muscle spasm and tenderness along the lumbar transverse process.  His forward lean [was] limited to 45 degrees, lateral bending [was] limited to 5 degrees to the right and left.  He [was] unable to extend beyond

---

[4] Plantar fasciitis "is one of the most common causes of heel pain. It involves inflammation of a thick band of tissue that runs across the bottom of your foot and connects your heel bone to your toes."  https://www.mayoclinic.org/diseases-conditions/plantar-fasciitis/symptoms-causes/syc-20354846. "Most people who have plantar fasciitis recover with conservative treatments, including resting, icing the painful area and stretching, in several months." https://www.mayoclinic.org/diseases-conditions/plantar-fasciitis/diagnosis-treatment/drc-20354851.

the neutral position.  His deep tendon reflexes, knee jerks and ankle [were] normal and symmetrical.  He could straight leg raise bilaterally up to 80 degrees with negative Lasegue's test.  His muscle strength was 5/5 both iliopsoas, quadriceps, hamstrings, anterior tibialis, gastroc soleus."[5]  (R. 279.)  Muhlrad recommended physical therapy and a diagnostic MRI scan of the lumbar spine for further evaluation and treatment, and prescribed Flexeril, an anti-spasmodic drug used to treat muscle spasms and musculoskeletal pain.  (R. 279-80.)

Plaintiff had an MRI in March 2014.  It showed "minor multilevel spurring and degenerative changes[; n]o significant disc bulging or local herniation."  (R. 384.)  He had another examination in April 2014.  Mulhrad observed shoulder impingement with 160 degree elevation but no erythema, ecchymosis, abrasion or effusion.  He had external rotation to 85 degrees and full muscle strength.  (R. 408-09.)  His right elbow was tender but displayed

---

[5] Lasegue's Test is a straight leg raising test done while the patient is supine.  (Def. Br. at 6.)  "The iliopsoas muscle flexes your hip, bends your trunk towards your thigh and rotates your thigh bone."  Hip Tendonitis, available at https://www.webmd.com/fitness-exercise/features/hip-tendonitis#1.  "The tibialis anterior muscle is the largest muscle located in the anterior (front) compartment of the leg . . . In general, muscles of this compartment help to flex the foot in an upward direction at the ankle and also extend the toes." Tibialis Anterior, available at https://www.healthline.com/human-body-maps/tibialis-anterior-muscle#1.  Gastroc soleus are calf muscles.  See https://www.healthline.com/human-body-maps/gastrocnemius-muscle#1.

full range of motion. (R. 409.) His right hip had positive impingement but displayed no erythema, ecchymosis, abrasion or effusion, and his range of motion in the hip was 115 of flexion, 10 degrees of internal rotation, 60 degrees of external rotation, 30 degrees of abduction, and 20 degrees of adduction. (R. 409.) His knee was stable on testing. (R. 409.) As to his spine, he was able to lean forward 50 degrees, had 10 degrees of lateral bend bilaterally, and 10 degrees of extension and rotation bilaterally. He could straight leg raise to 80 degrees and again had a negative Lasegue's Test. Mulhrad's impression was that Plaintiff had "multiple joint symptoms secondary to the conditions previously elaborated" and that Plaintiff should "follow up . . . on an as needed basis for the specific conditions he requests." (R. 409.)

e. Dr. McGinley

Plaintiff visited McGinley, an orthopedist, in June 2014. He reported right shoulder and joint pain at an 8 out of 10. The pain woke him up from sleep. He also said he had tingling and numbness going down to his hand. Plaintiff reported knee problems, at worst, at 7 out of 10. His knee hurt more when going up or down stairs, walking a moderate amount, getting in and out of a car or getting up and down from a chair. He had not been using assistive devices or pain medication. (R. 419.)

Upon examination, McGinley found "no palpable swelling, no erythema, no known fractures or deformities" of the right shoulder.  (R. 419.)  Plaintiff had strength and tone of 4/5 on his upper right side.  His active range of motion was 90 degrees, his passive range of external rotation was 90 degrees, and his passive range of internal rotation was 45 degrees.  (R. 419.)  His right knee exhibited tenderness.  (R. 419.)  He had "good stability" but a positive McMurray test, which is used to test for knee tears.  (R. 420; see Nusraty v. Colvin, 213 F. Supp. 3d 425, 431 n.1 (E.D.N.Y. 2016) (citing Stedman's Medical Dictionary (28th ed. 2006) (McMurray test involves "rotation of the tibia on the femur in order to determine whether the meniscus of the knee is injured.") (internal quotation marks omitted)).

McGinley gave him a shoulder injection to relieve the pain.  (R. 421.)  After discussion, Plaintiff decided to treat himself with exercise, nonsteroidal anti-inflammatory drugs ("NSAIDs"), and physical therapy.  (R. 421.)  Plaintiff visited McGinley again in November 2014; he was given another shoulder injection and planned to continue with physical therapy, icing, and exercise.  (R. 418.)

f.   Dr. Graber

In August 2014, at the request of the SSA, Plaintiff attended a consultative examination with Graber.  (R. 17, 413.)  Plaintiff reported that he had a torn meniscus and pain in his

right knee.  The pain on most days was a 7 on a scale of 1 to 10.
He had arthritis and a torn labrum and labral cysts in his right
shoulder, and the pain there was a 6 to 7 on most days.  He had
constant right elbow pain at a 6 to 7 for a few years.  He had
right hand, wrist, and hip arthritis for two to three years which
was a 6 most days.  (R. 413.)

Graber observed Plaintiff "to be in no acute distress."
(R. 414.)  She further found that (1) he "cannot walk on toes but
can walk on heels without difficulty," (2) he could fully squat,
(3) his stance was normal, (4) he needed no help changing for the
examination, (5) he needed no help getting on and off the table,
(6) he was able to rise from his chair without difficulty, and (7)
he used no assistive devices.  (R. 414.)  His "cervical spine
show[ed] full flexion, extension, lateral flexion and full rotary
movements bilaterally."  There was "no abnormality in the thoracic
spine."  His "[l]umbar spine show[ed] full flexion, extension,
lateral flexion and fully rotary movement bilaterally."  His
[s]traight leg raising [was] negative bilaterally."  He had "[f]ull
range of motion of the shoulders, elbows, forearms and wrists
bilaterally."  His "[j]oints [were] stable and nontender."  (R.
415.)  She noted "no motor or sensory deficit."  His "[s]trength
[was] 5/5 in the upper and lower extremities" and his "[h]and and
finger dexterity [was] intact" with "[g]rip strength 5/5
bilaterally."  (R. 415.)

After reviewing Plaintiff's self-reported complaints and performing the physical examination, she opined that Plaintiff "needs to avoid smoke, dust and other known respiratory irritants due to his history of asthma."  (R. 416.)

2.  ALJ's Decision

The ALJ concluded that "[t]he documentary record, viewed in totality, fails to comport with a finding of disability." (R. 15.)  The ALJ found "that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . ." (R. 18.)  He found,

> [a]fter careful consideration of the entire record . . . [that Plaintiff] had the [RFC] to perform light work as defined in 20 C.F.R. 404.1567(b) except never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch and crawl; occasionally perform overhead reaching, bilaterally; frequently reach in other directions with the right dominant upper extremity; and frequently handle, finger, and feel with the right dominant upper extremity.  In addition, [he] must avoid all exposure to irritants such as fumes, odors, dust, gases and poorly ventilated areas as well as hazards such as moving machinery and unprotected heights.

(R. 14.)  Under the applicable regulations,

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or

14

carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. 404.1567(b).

If a claimant cannot perform "light work,"

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a).

The ALJ found that "[t]reatment notes from [Plaintiff's] long-standing general practitioner . . . Burmeister, spanning the period December 2009 through December 2013, reveal very conservative care, primarily for musculoskeletal complaints affecting varying body parts and occurring at varying/intermittent intervals." (R. 16.) Burmeister's prescribed "care largely consisted of the prescription of anti-inflammatory medication and

the advice to rest and ice, as needed." (R. 16.) He noted long periods of time between Plaintiff's visits. (R. 16.) After recounting Burmeister's records, the ALJ summarized her and Kelly's assessments as "find[ing] that, during the course of an eight-hour workday, [Plaintiff] can sit no[ ] more than one 1 hour, stand/walk no more than 1 hour and avoid lift/carry even 10 pounds. In addition, they further opined that [Plaintiff] should avoid bending, squatting and reaching." (R. 18.) The ALJ afforded "little weight" to Burmeister and Kelly's opinions because "the record as well as [Plaintiff's] own description of his daily activities fails to establish such a significant degree of limitation." (R. 18.)

As to independent examiner Graber, the ALJ summarized her opinions and found that her "[p]hysical examination failed to comport with a finding of disability." (R. 17.) However, he only afforded her opinion "some weight" because he found "the lack of any exertional limitations, given the ongoing complaints, to be not persuasive." (R. 18.) The ALJ thoroughly summarized Muhlrad's treatment records and examination findings and briefly addressed McGinley's care of Plaintiff. (R. 16-17.)

The ALJ thus based his RFC conclusion upon opinions he either gave "some" or "little" weight to. However, he thoroughly recounted the treatment records, examination results, and recommendations from the doctors. "Although the ALJ's conclusion

may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) ("As the ALJ explained in his opinion, his RFC assessment took account of the opinions of all of these experts and the notes of other treatment providers.").[6] In Pellam v. Astrue, the plaintiff "essentially argue[d] that an ALJ cannot determine a claimant's functional limitations without the support of at least some medical opinion concerning those limitations." 508 F. App'x 87, 89 (2d Cir. 2013). However, the Second Circuit concluded that "the ALJ's residual functional capacity analysis was reasonable and supported by substantial evidence" because (1) the plaintiff had told doctors "she had limited or no pain" since her two back surgeries, (2) tests performed by her treating physician and the consultative physician "showed at times that she had some limitations in her range of motion, but also that she had a full range of motion in her bilateral extremities and a normal range of motion in her lower extremities," and (3) "the ALJ's ultimate determination took account of the fact that [the plaintiff] experienced at least some pain, that her range of motion

---

[6] Plaintiff makes no argument that the ALJ did not adequately explain his reasons for not giving Burmeister's opinion "good weight."

was somewhat limited, and that she needed to alternate between sitting and standing." Id. at 90-91. This was so even though the ALJ had "rejected" the consultative physician's opinion. See id. at 89-90; see also Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8-9 (2d Cir. 2017) ("Because the ALJ reached her RFC determination based on [the treating physician's] contemporaneous treatment notes--while at the same time rejecting his post hoc medical opinion ostensibly based on the observations memorialized in those notes--that determination was adequately supported by more than a mere scintilla of evidence.").

The Second Circuit has "defined 'substantial evidence' as more than a 'mere scintilla,' and as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Barry v. Colvin, 606 F. App'x 621, 622 (2d Cir. 2015) (quoting Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013)). Further, "lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits." Id. "When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other

evidence in the record." Id.

Here, the Court finds that the ALJ adequately considered the documentary evidence, treatment notes, and Plaintiff's own testimony regarding his limitations. Even Burmeister, Plaintiff's treating physician, only prescribed conservative care mainly consisting of anti-inflammatories, rest, and ice. See Harkins v. Colvin, No. 15-CV-5223, 2016 WL 8669981, at *13 (S.D.N.Y. Dec. 8, 2016), R&R adopted, 2017 WL 1239655 (S.D.N.Y. Mar. 31, 2017) (the ALJ "explained that he found the opinion was inconsistent with other evidence in the record, namely, treatment notes by [the treating physician], Plaintiff's conservative course of treatment, and Plaintiff's stated activities of daily living.").

As to Plaintiff's contention that the ALJ "ignore[d his] generalized testimony" that his daily activities were accompanied by pain and "that [ ]he had difficulty with performing some of these activities, 'disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment.'" Donnelly v. Comm'r of Soc. Sec., 49 F. Supp. 3d 289, 307 (E.D.N.Y. 2014) (quoting Prince v. Astrue, 490 F. App'x 399, 400 (2d Cir. 2013)). By his own account, Plaintiff could perform normal daily tasks and even walk up to a mile without rest. See Harkins, 2016 WL 8669981 at *17 ("These activities of daily living further support the ALJ's determination

that Plaintiff was capable of light work, and the ALJ did not err in considering these activities and the extent to which they casted doubt on Plaintiff's assertion of disability."). The Court thus finds that substantial evidence supports the ALJ's RFC finding.

B.  The Step-Five Finding

1.  Vocational Expert Dawn Blythe

Plaintiff accepted Blythe's qualifications to testify as a vocational expert. She identified his past work as a firefighter as "exertional level very heavy." (R. 95.) The ALJ posed three hypotheticals to Blythe. First, he asked her to address a person of the same age, education, and work experience as Plaintiff "with an ability to life up to 20 pounds occasionally; lift or carry up to 10 pounds frequently; stand or walk for approximately six hours for an eight-hour workday; and sit for approximately six hours for an eight-hour workday with normal breaks." (R. 95.) As to limitations with the first hypothetical, the ALJ proposed "no climbing of ladders, ropes or scaffolds; occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching and crawling . . . limit[ing] overhead reaching to the occasional level bilaterally . . . provid[ing] for frequent reaching in other directions with the right dominant upper extremity [ ] and frequent handling, fingering and feeling with the right dominant upper extremity." (R. 95.) Further, the hypothetical individual "should avoid exposure to irritants such

as fumes, odors, dust, gases and poorly ventilated areas [and] hazards [such as] moving machinery and unprotected heights." (R. 95-96.) Blythe found that the individual in the first hypothetical would be unable to perform Plaintiff's past work as a firefighter, but would be able to perform "exertional level light" positions in the national economy such as sales attendant, mail clerk, or office helper. (R. 96.)

The ALJ gave a second hypothetical adding "no overhead reaching bilaterally," and Blythe found that the individual would be able to perform the same jobs as in the first. In a third hypothetical, where "the individual could only sit, stand or walk less than one hour per day," Blythe found that would be "work preclusive." (R. 96.) Because the Dictionary of Occupational Titles,[7] which Blythe relied upon in forming her opinions, did not address specific overhead reach, she based that conclusion on her "training and experience." (R. 97.)

Plaintiff's attorney then modified the hypotheticals by restricting the individual "to reaching only occasional[ly] in all directions with the right dominant hand." (R. 97.) Blythe said

---

[7] The SSA "may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity." 20 C.F.R. § 404.1560.

this would preclude the jobs of sales attendant, mail clerk, and office helper, but would not preclude other positions, such as an usher, counter attendant, or investigator of dealer accounts. (R. 97-98.) For the jobs listed, Blythe stated that the "[n]o more than 10% off task time" and "[n]o more than one day per month" of "absenteeism or tardiness" would be acceptable. (R. 98.)

### 3. ALJ's Decision

The ALJ concluded that Plaintiff's "ability to perform all or substantially all of the requirements of [the unskilled light occupational base] was impeded by additional limitations." (R. 19.) Based on Blythe's testimony, which he found consistent with the information from the Dictionary of Occupational Titles, the ALJ concluded that Plaintiff "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (R. 19.)

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four. At Step Five, the burden shifts to the Commissioner to show there is other work that the claimant can perform." McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014) (internal quotation marks and citations omitted). "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the

vocational expert based [her] opinion and accurately reflect the limitations and capabilities of the claimant involved." Id. at 151 (internal quotation marks and citations omitted).

Plaintiff argues "that it was an abuse of discretion for the ALJ to disregard the vocational testimony with regard to [his ability to reach, handle, finger, and feel]" and that "the VE testified that most all work would be ruled out if an individual of the Plaintiff's same age and education would only be able to occasionally reach, handle, finger and feel." (Pl. Br. at 11, 12.) This argument is without merit. The ALJ's hypotheticals comported with an RFC for light work with the limitations in Plaintiff's RFC, which is supported by substantial evidence. See Springfield v. Comm'r of Soc. Sec., No. 16-CV-6947, 2019 WL 1508994, at *13 (E.D.N.Y. Mar. 31, 2019) ("an ALJ certainly is not required to incorporate restrictions into the RFC or pose a hypothetical to a vocational expert] that [is] not supported by the record" (internal quotation marks and citations omitted; alterations in original)). Thus, the step five finding is also supported by substantial evidence.

CONCLUSION

For the foregoing reasons, the Commissioner's cross-

motion (D.E. 12) is GRANTED and Plaintiff's motion (D.E. 10) DENIED.  The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.

                              SO ORDERED


                              /s/ JOANNA SEYBERT_____
                              Joanna Seybert, U.S.D.J.

Dated: September __30__, 2019
       Central Islip, New York